UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO: 13-30015-01-TSH |
| | : | |
| LUZANDER MONTOYA | : | |
| | : | |

**DEFENDANT'S SENTENCING MEMORANDUM
AND MOTION FOR A DOWNWARD VARIANCE**

**Introduction**

Defendant Luzander Montoya, through undersigned counsel, respectfully submits this Sentencing Memorandum in connection with his sentencing on August 26, 2015. The defendant recommends a sentence of 48 months' imprisonment. This request is based on his lengthy efforts at rehabilitation as exemplified in attached letters and documents; in his open disavowal of La Familia and subsequent retribution suffered at the hands of La Familia; in his efforts to assist law enforcement; and the likelihood of success under close Probation supervision. Mr. Montoya's rehabilitation was also in evidence in critical documents that the government failed to turn over until mid-trial: complete multi-day debriefings of cooperating witness David Rodriguez in July 2012 in which Rodriguez identified every serious drug dealer or gang member he knew, yet failed to once mention Mr. Montoya. *See* Dkt. No. 210 (filed under seal). Although the government touted its three-year investigation of La Familia (Dkt. No. 7), its investigation in fact showed that Mr. Montoya had divorced himself from gang life.

Mr. Montoya was found guilty after a jury trial on April 10, 2015 of three counts of possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C.

1

§ 841(a)(1). Dkt. No. 187. The three sales involved relatively small quantities of heroin (totaling 5.21 grams) with a modest penalty. As a career offender, however, Mr. Montoya faces 17.5 years or more.

Mr. Montoya understands that in arriving at a sentence, the Court must consider the advisory United States Sentencing Guidelines ("U.S.S.G."). In addition, however, the First Circuit has indicated that a sentencing judge should consider other factors that might make a sentence outside of the guideline range appropriate. Those factors are enumerated at 18 U.S.C. § 3553(a). *United States v. Jiminez-Beltre,* 440 F.3d 514, 518-19 (1st Cir. 2006) (*en banc*). Montoya believes the advisory guidelines as found by the Presentence Report are, in his case, particularly onerous. A variance in this case would be appropriate.

**The Advisory Guidelines/Unresolved Issues**

The PSR has correctly calculated Mr. Montoya's Adjusted Offense Level at 12. The career offender guideline, U.S.S.G. § 4B1.1, raises the offense by 20 levels to level 32. Even though Mr. Montoya falls within Criminal History Category VI, the non-Career Offender offense level of 12 would yield a guideline range of 30-37 months. In stark contrast, the Career Offender provision places Montoya in level 32, with a guideline range of 210-262 months, a seven-fold increase. The sentence disparity created by the Career Offender guideline yields a sentencing range that is far greater than necessary to meet the purposes of sentencing in this case. The Career Offender provision overstates the seriousness of Montoya's behavior or the likelihood that he will continue along a criminal path.

Two predicates that place Mr. Montoya in the Career Offender category, cocaine distribution in 2007 (*PSR ¶37*) and assault by dangerous weapon in 2009 (*PSR ¶38*) occurred during the period of time that Mr. Montoya was associating with La Familia members. Mr. Montoya realized that his allegiance to La Familia was having a devastating effect on his life. Although he resolved to disentangle himself from the gang in 2009, it proved more difficult than he realized. Initially, Mr. Montoya made unsuccessful gestures towards freeing himself, always deterred by threats of retribution. Finally in 2011, he left the gang and suffered a "beat down" as a punishment. *PSR ¶ 58*. Montoya believes it was worth the punishment because now he has his life back.

The third alleged Career Offender predicate occurred after Mr. Montoya left La Familia. It involved a domestic disturbance with Denisse Luna, the mother of his two children. The PSR provides the background to their relationship. At the time they met and began living together, Ms. Luna was pregnant with Mr. Montoya's daughter, Deniangeliz Luna, presently age 10. The child has never known a father other than Mr. Montoya. *PSR ¶56*. The couple went on to have two more children of their own. The disturbance and charges of assault and battery and threat to commit a crime were the result of a jealous rage. Mr. Montoya's behavior was inexcusable. Nonetheless, Ms. Luna related to the Probation Officer that she remains supportive of Mr. Montoya, stating the incident "was blown out of proportion." *PSR ¶60*. *See* Exhibit B.

Mr. Montoya reiterates his objections to the PSR regarding his Career Offender status. Even under the guidelines, however, Mr. Montoya is eligible for a downward departure.

§4A1.3(b) Downward Departure from Career Offender Provision

> (1) The Standard for Downward Departure---"if reliable information indicates that the defendant's criminal history category substantially overrepresents the seriousness of the defendant's criminal history **or the likelihood that the defendant will commit other crimes, a downward departure may be warranted."** [emphasis added]

The policy statement envisions departures in two distinct situations. The first is when the criminal history category overstates the seriousness of a defendant's criminal past. The second occurs when the criminal history category fails to reflect the defendant's likely criminal future. The sentencing court should keep these considerations separate.

The policy statement also places limitations on the extent of the downward departure, advising that for a Career Offender, the court may not depart more than one criminal history category. §4A1.3(b)(3)(A). Notwithstanding this policy, most appellate courts have held that the Commission promulgated §4A1.3 pursuant to the departure statute, 18 USCA §3553(b), which provides that a court may depart from the applicable guidelines range if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into considerations by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Consistent with this interpretation, *United States v. Booker*, 543 U.S. 220 (2006), made the guidelines advisory, so the policy statement limiting the extent of the departure is no longer mandatory. *See United States v. Corner*, 598 F.3d 411 (7th Cir. 2010) (*en banc*) (holding that all guidelines including the career offender guideline are advisory.)

Mr. Montoya went to trial because of the high stakes involved with this conviction. He does not deny providing heroin in response to David Rodriguez's repeated requests and appeal to friendship. He is indeed remorseful.

### Nature and Circumstances of the Offense

At the time that Montoya renounced La Familia, he made efforts to work with the Gang Task Force (GTF). He met with FBI agents and was fully debriefed. Although Montoya's efforts to purchase guns and drugs from gang members were unsuccessful, he provided information that has assisted the GTF in pursuing various targets.

### Minor Role

Although Mr. Montoya understands that role has no application to the career offender provision, he wishes the Court to consider the relevance of his role when deciding a final sentence under the provisions of 18 U.S.C. § 3553(a). Montoya believes he is eligible for a minor role reduction. The Second Circuit has read application note 4 (then 1) to mean that a "lack of knowledge or understanding [of the scope of the enterprise] is . . . a relevant factor to be considered in reaching a finding of minor role." *United States v LaValley,* 999 F.2d 663, 665 (2nd Cir. 1993). The Seventh Circuit has determined that whether or not a defendant profits from an offense does not reflect upon that person's role in the offense. *United States v Corral,* 324 F.3d 866, 874(7th Cir. 2003). Montoya does not deny that he sold heroin in response to Rodriguez's repeated requests and claim to be "dope sick." But there is no evidence that Mr. Montoya was involved in a large heroin trafficking organization or that he was actively dealing aside from his discrete transactions with Rodriguez.. He would accordingly be eligible for a minor role adjustment.

**History and Characteristics of Luzander Montoya**

Luzander Montoya has never known a stable family life. Born the only child to a disinterested father and an alcoholic, drug-addicted mother, Mr. Montoya, like many others, found refuge in a street gang. According to the PSR, Mr. Montoya has had no relationship with his father since his parents separated and his mother moved with him to Holyoke, Massachusetts. The father has been living in Lima, Peru for the past six years. Mr. Montoya has two maternal half-sisters with whom he shares a warm relationship. His older half-sister, Kazandra Marrero, writes:

> My brother has made mistakes, horrible ones but he's not a career criminal, he was a kid who grew up in the street, that didn't know better, because his mother rathered smoke crack-cocaine and drink instead of raising her children in a stable, safe environment. We didn't have it easy growing up, but my brother had it worse. Since birth my brother had to fight to survive, he was born with a closed stomach and needed surgery a week into his life, to almost burning alive at the tender age of 1,[1] due to the inadequacy of our mother, Mrs. Luz Agron, who unfortunately has deemed to be an unfit mother for the great majority of our life.

*See* Exhibit A. The mother, plagued with drug, alcohol and mental health issues, was totally incapable of caring, for any of her three children. Kazandra describes life without a mother:

> I would like to take a minute to share a bit of the walks of life we've endured. I'm going to make a very long and sad story, short. We are three siblings, we share the same mother. I'm the oldest, my brother and our youngest sister. [Kazandra Marrero 33, Luzander Montoya, 29, and Aisha Gonzalez, 24] It saddens to the core till this day to say my/our mother has never been your typical, homemaker, cookie cutter mother. On the complete opposite our mother has always battled with drugs and alcohol. Her drug of choice crack-cocaine, however alcohol was her primary…vice. For example I was born prematurely and underwent alcohol withdrawals, to which my/our mother proudly admits to drinking vodka through-out her pregnancy and also how she wanted to abort me. Hadn't it been for our late grandmother (RIP), Josefa Rivera who intervened for us, our story I believe would've been an even worse one. It was a pure blessing

---

[1] The defendant did not report the burning incident to Probation, probably because he did not remember it as a one-year old.

>that my grandmother and I shared a birthday being one of the reasons that kept my/our grandmother on top of my/our mother, threatening her to take me away if she continued on that destructive path.

Exhibit A. Kazandra relates that since their mother did not stop drinking and using cocaine, out of desperation, their grandmother took Kazandra, Luzander and their mother to Puerto Rico. But the mother could not last in Puerto Rico and she took Luzander back to Holyoke, leaving Kazandra with their grandmother. The mother promised to send for Kazandra as soon as she straightened herself out. Instead, the mother got involved in a bad relationship, was introduced to crack-cocaine and had their baby sister, Aisha. It was then that Kazandra remembers her mother hit "rock-bottom." Although the grandmother and Kazandra had travelled back and forth to Holyoke to check on Montoya's mother, it was at his mother's low point, when the grandmother moved permanently to Holyoke to care for the 8 year-old Luzander and 2 year-old Aisha. During all the time before the grandmother arrived, Luzander cared for his little sister.

   Quite tragically for the children, their grandmother died of a brain tumor. This event sent their mother into a very deep depression, and deeper into drugs and alcohol. What followed for the mother and children were very dark days until the mother met someone who helped her achieve sobriety for about five years. That was the hiatus that allowed the children to see what their mother might have been. Sadly, she returned to her nightmare of drugs and alcohol which she continues to this day. According to the PSR, Mr. Montoya has not spoken to his mother in years.

   The years of turbulence for the young Montoya without a mother or any male role model have had a tragic effect on his life. Long-term studies of large samples of urban adolescents in Rochester, New York, and Seattle, Washington, have identified causal risk

factors for gang membership, and Mr. Montoya fit many of these risk factors.[2]  "The most important community risk factor is growing up in neighborhoods in which the level of social integration (attachment) is low. . . .  Among family variables, poverty, absence of biological parents, low parental attachment to the child, and low parental supervision, all increase the probability of gang membership."[3]  To be sure, Montoya's family variables posed a grave risk.  He was living in a high crime area in Holyoke with a drug-addicted mother who showed no concern or affection for her children.  Other risk factors include "low expectations for success in school (both by parents and students), low student commitment to school and low attachment to teachers."[4]  The PSR indicates a poor early commitment to school leading to Mr. Montoya's being expelled prior to the eleventh grade. *PSR ¶64.*

The Seattle study opines that "the most important peer group factor is associating with law-violating peers.  Individual risk factors are the early use of alcohol and marijuana, prior delinquency, hyperactivity, externalizing behaviors (hostility, aggression, and rule breaking), poor skills in refusing offers to engage in antisocial behavior, and early sexual activity.  Being a male, feeling unsafe in the neighborhood, and residing in a poor family put youth at high risk for gang involvement, regardless of

---

[2] Rochester and Seattle findings are available and reported in http://www.ojjdp.gov/jjbulletin/9808/contents.html.

[3] http://www.ojjdp.gov/jjbulletin/9808/why.html

[4] *Id*.

other community, family, school, or peer risk factors."[5] The PSR and Kazandra Marrero's letter are replete with examples of risk factors indicating that Mr. Montoya was a prime candidate for joining a gang. At age 15, Mr. Montoya was committed to Department of Youth Services. *PSR ¶49*

By seventeen years old, Mr. Montoya had begun his one and only romantic relationship with his significant other, Denisse Luna. Together they have two children. When they met, Denisse was pregnant with her daughter, Deniangeliz, presently 10 years old. Mr. Montoya took on the responsibility of fatherhood in place of the biological father who had no interest in the child. Deniangeliz writes of how much Mr. Montoya means to her:

> I need my father because we need him to help my mom with us and I need him to make me happy and I can't even remember the time I was happy without him. And sometimes I dream that he came home and we had him to come to come home to. And he was just the best dad ever and I like him he made me happy seeing his face just makes tear up…and even when I'm sad he always made me smile…so we always have fun when he's around. So I hope that he would come home.

Exhibit D. Mr. Montoya knows what it is like not to have a father. He wanted to do the best for Deniangeliz. His son, Luzander Jr also writes of his affection for his father:

> My dad and me spend a lot of time together. When daddy left I felt angry, sad and mad at myself because I lost my best dad. I don't visit my dad a lot anymore because he is very far away I am starting to forget what my daddy looks like. I miss talking to him, playing, wrestling with him, eating dinner with him as a family and him taking me to the park and getting me Dunkin Donuts after. Now things are different. It's hard for my mom to do things with us because she is always working to pay bills because daddy is gone and can't help us. Please let my dad come home soon. We need him. Sometimes I behave bad at school and

---

[5] Hill, K.G., *et al.*, *The longitudinal dynamics of gang membership and problem behavior: A replication and extension of the Denver and Rochester gang studies in Seattle* (November 1996). Paper presented at the annual meeting of the American Society of Criminology, Chicago, IL, cited at http://www.ojjdp.gov/jjbulletin/9808/why.html.

mean to my mom because my heart wants my dad.  I want to say I am seven years old and can't write too good.  So I told my mom to write for me.  I love you dad. Exhibit C.

The PSR details Mr. Montoya's early involvement with La Familia and the stress his activities placed on his relationship with Ms. Luna and his children.  As he recounted, Mr. Montoya led a double life, doing family related activities with his real family and then working La Familia activities into the rest of his life.  Finally, disillusioned with belonging to La Familia, Montoya disentangled himself from the gang.  This took time and finally, in 2011, he severed ties with the gang and suffered a "beat down." *PSR ¶58*.

Mr. Montoya's quest for an honest lifestyle, free of La Familia, began in 2009. Evidence of his efforts can be seen in the certificates appended to this memorandum. Starting with securing a GED in 2006, Luzander went on to successfully complete a ServSafe Certification in Food Protection management in July 2009; earned a Certificate of Achievement in Custodial Technician Bas Examination in October 2009; Completed the 10-hour OSHA training course for the Construction Industry in 2011; earned a Certificate in Culinary Arts in 2013; National Restaurant Association awarded him a certificate for mastering the competencies in Hospitality and Restaurant Management in 2013; earned a Certificate of Achievement in Life Skills in 2013.  Montoya had secured an interview with Bricklayers and Allied Craftsmen Local No3 in 2013.  He had to forgo the interview because he was incarcerated.  For all of his fits and starts, it is clear that Montoya was making strides to put his life on track.  *See* Exhibit F.

Denisse Luna has been the one and only woman he has ever been involved with in a long term relationship.  She continues to love him and wishes him to father his children. She writes:

> I have known Luzander for about 20 years and was in a relationship with him for 11 of those years. I don't regret any of our journey even though we had our ups and downs. I will always have love for this man, and will be there to support him in any way.
>
> I am very aware of the situation Luzander was found guilty of. I would like to say that he was and very much wanted to change his life around for himself and his family. He was employed and was providing the best he could for us. We have talked about this situation and how this mistake has affected his children. His 7 year old son was very damaged by his dad going away and I put him in therapy to try to get him through this hard time.
>
> Luzander is a very loving, caring, funny, smart, outgoing person. He is an awesome friend and an even better fiancée. Luzander has a very amazing bond with his children. We have a 2 year old that has missed out in experiencing how great it was to have him around. I wish he could still come home in time to help me with the upbringing of our children. Because of Luzander's situation and me having to work two jobs to provide for our children I feel as though our children have been missing out on things for the past 2 years…I know that Luzander regrets all that he has done to get him to this point in his life and I'm sure he would like to move forward from this nightmare…

*See* Exhibit B.

**Meeting the Purposes of this Sentence**

The post-*Booker* approach to sentencing is now well-established. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 522 U.S. 38, 49 (2007); *United States v. Zapete-Garcia*, 447 F.3d 57, 59 (1st Cir. 2006) (quotations omitted). After both parties have been given a chance to argue their respective positions on an appropriate sentence, "the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 522 U.S. at 49-50; *Zapete*, 447 F.3d at 59 (sentencing court "must consider factors identified by the parties" as well as "the several sentencing factors set out in 18 U.S.C. §3553(a)").

However, "the Guidelines are not the sole, nor even the first among the factors

that Congress has commanded the courts to apply in section 3553(a)." The Court "may not presume that the Guidelines range is reasonable" and must "make an individualized assessment based upon the facts presented." *Gall*, 522 U.S. at 50. Indeed, "the Guidelines are only one of the factors to consider . . . and 3553(a) directs the judge to consider sentences other than imprisonment." *Id*. at 59 (emphasis added). The Supreme Court later re-emphasized that the "Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original).

In *United States v. Yonathan Rodriguez*, 527 F.3d 221 (1st Cir. 2008), the First Circuit stressed that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *Id*. at 228. That overarching principle is to "impose a sentence sufficient, but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added). These broad goals include the need to reflect on the seriousness of the offense, promote respect for the law, provide just punishment, create adequate deterrence, protect the public from future crimes, and provide the defendant with necessary treatment and training. 18 U.S.C. §3553(a).

Many courts have come to question the wisdom of sending every drug defendant to jail for long periods of time as mandatory minimums and guidelines required. Commission data confirm that courts are increasingly skeptical of the drug guidelines. Sentencing Commission data for fiscal 2014 show that only 27.3 % of

defendants convicted of drug trafficking were sentenced within the guideline range.[6] *Table 27 appended as Exhibit G.* Even considering the seriousness of heroin, in the District of Massachusetts, Sentencing Commission data for 2013 show that only 35.4% of heroin defendants were sentenced within the guideline range. [7] *Table 45-8 appended as Exhibit H.*

## The Sentence Imposed Should Protect the Community

Incapacitation is often thought to be the only way to protect the community from certain types of criminals. Interestingly, the Sentencing Commission conducted research on crack defendants who were released immediately before and after the implementation of the 2007 Crack Cocaine Amendment, and followed in the community for five years. [8] Commission staff compared the group affected by the 2007 amendment with offenders who would have been eligible to seek relief from the amendment, but were released before the effective date and had served their full prison term. The Commission found: "There is no evidence that offenders whose sentence lengths were reduced pursuant to retroactive application of the 2007 Crack Cocaine Amendment had higher recidivism rates than a comparison group of crack offenders who were released before the effective date of the 2007 Crack Cocaine Amendment and who served their full prison terms less earned credits."[9]

---

[6] Source: U.S. Sentencing Commission, 2014 Datafile, USSCFY13, Table 27 available at ussc.gov.

[7] Source: This was produced using the U.S. Sentencing Commission's interactive Sourcebook (isb.ussc.gov) using the Commission's fiscal year 2013 Datafile, USSCFY2012. Table 45-8PDF.

[8] In 2007, the U.S. Sentencing Commission amended the Drug Quantity Table for offenses involving crack cocaine. The amendment, effective November 1, 2007, reduced the drug quantity table for crack cocaine by two levels. The Commission also voted to give retroactive effect to the amendment. Retroactive application of the amendment was effective March 3, 2008.

The Brennan Center for Justice has recently issued a 139-page report: *"What Caused the Crime Decline?"*, February 12, 2015.  The report examines the dramatic decline in crime nationwide over the past two decades and analyzes various theories for why it occurred.  The report finds that increased incarceration has been declining in its effectiveness as a crime control tactic for more than 30 years.  Its effect on crime rates since 1990 has been limited, and has been non-existent since 2000.  More important were various social, economic and environmental factors, such as growth in income and an aging population.  The report concludes that programs that improve economic opportunities, modernize policing practices, expand treatment and rehabilitation programs, all could be a better public safety investment.[10]  As this and other reports relate to Luzander Montoya, imposing the harsh career offender sentence will do nothing to protect the community or ensure that he does not reoffend.  Rather, punishing him with a short sentence and providing him with the much needed employment and counseling will go a long way to putting his criminal life behind him while ensuring that the community is safe.  With the assistance of the Probation Department, which will provide him with the necessary tools to find a job and maintain it, there is a small risk that Montoya poses any danger to the community.

### Montoya's Personal Culpability

In a Supreme Court decision involving life without parole for juveniles, the Court

---

[9] *Recidivism Among Offenders Receiving Retroactive Sentence Reductions: The 2007 Crack Cocaine Amendment,* May 2014, pp. 1-2.  Available at www.ussc.gov.

[10] "What Caused the Crime Decline?" February 12, 2015, Oliver Roeder, Lauren-Brooke Eisen, Julia Bowling, Brennan Center For Justice.  Document available at
https://www.brennancenter.org/publication/what-caused-crime-decline

considered the purposes of sentencing that apply to all sentences. *Graham v Florida,* 560 U.S. 48 (2010). With regard to retribution, the Court cited *Tison v. Arizona,* 481 U.S. 137, 149 (1987), for the proposition that "[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Graham,* 560 U.S. at 71. Luzander Montoya asks this Court to consider his personal culpability in light of his traumatic childhood and the life-long issues of neglect he struggles with; his success in leaving La Familia, where he once felt an allegiance; his subsequent efforts to cooperate with the government. "Under §3553(a) and the decisions of the Supreme Court, a sentencing court may properly consider a defendant's motive. *Wisconsin v Mitchell,* 508 U.S. 476, 485 (1993) ("the defendant's motive for committing the offense is one important factor"). Mr. Montoya's motive for this transaction was to assist a friend who claimed to be "dope sick." Indeed, Rodriguez's claims of dope sickness to induce Mr. Montoya to obtain heroin for him amount to coercion and duress within the meaning of U.S.S.G. § 5K2.12, which sanctions a departure on this ground.

Disregard for a defendant's personal culpability has been true of drug cases where quantity rules guidelines and mandatory sentences without regard to an individual's personal characteristics. *U.S. v Rivera,* 192 F.3d 81, 84 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood –at some level of severity—can impair a person's mental and emotional conditions"; "in extraordinary circumstances . . . district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional condition that contributed to the defendant's commission of the offense."); *see Penry v. Lynaugh,* 492 U.S. 302, 319 (1989) ("Underlying *Lockett* and *Eddings* [citations omitted] is the principle that punishment should be directly related to the

personal culpability of the criminal defendant.  If the sentencer is to make an individualized assessment of the appropriateness of the . . . penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.")  Montoya asks this Court to consider the proposed sentence in light of his traumatic background, and possible diminished capacity.

The Supreme Court opinion in *Graham* makes another point relevant to Montoya's case.  "Even if the punishment has some connection to a valid penological goal, it must be shown that the punishment is not grossly disproportionate in light of the justification offered."  520 U.S. at 72.   The proposed sentence of 48 months is proportionate punishment in light of Mr. Montoya's limited role in the conspiracy and the relatively small amount of heroin attributable to him.  It promotes respect for the law and sufficiently reflects the seriousness of this offense because it recognizes the need to punish Mr. Montoya.

## Deterrence

In 2004 the Sentencing Commission issued the results of a study conducted to learn the effects of guidelines.[11]   The Commission openly admitted that in cases involving prior non-violent drug offenses, such as this one, the career offender guideline promotes neither general nor specific deterrence and does not, therefore, promote the

---

[11] http://www.ussc.gov/research-and-publications/research-projects-and-surveys/miscellaneous/fifteen-years-guidelines-sentencing

§3553(a) purposes of sentencing. With respect to general deterrence the Commission observed:

> Unlike repeat violent offenders, whose incapacitation may protect the public from additional crimes by the offender, criminologists and law enforcement officials testifying before the Commission note that retail-level drug traffickers are readily replaced by new drug sellers as long as the demand for the drug remains high. Incapacitating a low-level drug seller prevents little, if any drug selling; the crime is simply committed by someone else.[12]

There are other aspects to Mr. Montoya's background that will assist him while he is in the community. The Bureau of Justice Statistics and the Office of Probation and Pretrial Services issued a study of *"Recidivism of Offenders on Federal Community Supervision"* conducted by ABT Associates Inc., December 21, 2012.[13] Among many findings the study highlights, "[s]everal protective factors can decrease offenders' risks of committing new offenses or being revoked include having a strong social support system, marketable skills (*i.e*. strong educational foundation or life skills), motivation to change, and age."[14] Mr. Montoya has a strong motivation to change, he has the support of his sister, Kazandra Marrero, his former partner, Denisse Luna, and the love of his children. He may have a marketable skills in the food industry as his certificates of achievement indicate.

---

[12] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/chap4.pdf. It is noted that the quote references mostly low-level drug dealers. The "violent" predicates attributable to the defendant do not fairly characterize Montoya as violent by nature.

[13] https://www.ncjrs.gov/pdffiles1/bjs/grants/241018.pdf

[14] *Id.* at p. 1.

**Unwarranted Disparity**

A fundamental goal of sentencing reform, to avoid unwarranted disparity, has been consistently undermined by mandatory minimums and career offender provisions where different individuals cannot be treated differently.  "A just legal system seeks not only to treat different cases differently but also to treat like cases alike.  Fairness requires sentencing uniformity as well as efforts to recognize relevant sentencing differences." *Pepper v United States,* 131 S. Ct. 1229, 1252 (2011) (Breyer, J. concurring in part and concurring in the judgment).  The marked disparity between the career offender penalty and the crimes Mr. Montoya committed is unwarranted by any measure.

Clearly, incarcerating Mr. Montoya at anything at or near the career offender range found by the PSR would undermine a sense of fairness.

**Conclusion**

All things considered, Mr. Montoya's very difficult childhood and subsequent haven as a gang member with La Familia led him to make very bad choices.  Now, at 29 years old, he has left La Familia and wishes to put his life on track.  There is every reason to believe that Denise Luna and he will work well together as parents in raising their children.  Ms. Luna continues to support him and wishes him to continue being the father the children have grown to love.  Mr. Montoya has demonstrated through the certificates of achievement that wants to change his life and work at a job that will contribute to the health of his family.  Considering that he is not hampered with alcohol or drug abuse, the counseling and job

assistance he will get from the U.S. Probation department will go a long way to helping him achieve his goal.

Dated: August 19, 2015          Respectfully submitted,

                                            /s/*Andrew Levchuk*
                                            Andrew Levchuk
                                            BBO #545189
                                            Bulkley, Richardson and Gelinas, LLP
                                            1500 Main Street, Suite 2700
                                            Springfield, MA 01115-5507
                                            Tel: 413-781-2820
                                            Fax: 413-272-6806
                                            Email: alevchuk@bulkley.com

## CERTIFICATE OF SERVICE

        I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), this 19th day of August, 2015.

                                             */s/Andrew Levchuk*
                                             Andrew Levchuk